# Exhibit B

| | |
|---|---|
| PILLSBURY WINTHROP SHAW PITTMAN LLP (pro hac vice)<br>MARK L. KROTOSKI (pro hac vice)<br>California Bar No. 138549<br>Email: mark.krotoski@pillsburylaw.com<br>2550 Hanover Street<br>Palo Alto, CA 94304-1115<br>Telephone: (650) 233-4500 | PILLSBURY WINTHROP SHAW PITTMAN LLP (pro hac vice)<br>RICHARD P. DONOGHUE (pro hac vice)<br>New York Bar No. 2511236<br>Email: richard.donoghue@pillsburylaw.com<br>31 W 52nd Street<br>New York, NY 10019<br>Telephone: (212) 858-1000 |
| CLARK HILL PLLC<br>PAOLA M. ARMENI<br>Nevada Bar No. 8357<br>Email: parmeni@clarkhill.com<br>1700 South Pavilion Center Drive, Suite 500<br>Las Vegas, Nevada 89135<br>Telephone: (702) 862-8300 | ANDERSON KILL, P.C. (pro hac vice)<br>SAMUEL M. BRAVERMAN (pro hac vice)<br>New York Bar No. 2553808<br>Email: SBraverman@AndersonKill.com<br>7 Times Square, 15th Floor<br>New York, NY 10036<br>Telephone: (212) 278-1008 |

Attorneys for Defendant, Eduardo Lopez

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>EDUARDO RUBEN LOPEZ,<br><br>    Defendant. | Case No. 2:23-cr-00055-CDS-DJA<br><br>**DECLARATION OF SUZANNE M. STUCKWISCH** |

DECLARATION OF SUZANNE M. STUCKWISCH      1

**DECLARATION OF SUZANNE M. STUCKWISCH**

I, Suzanne M. Stuckwisch, hereby declare and state as follows:

1. I am a Managing Director at Alvarez and Marsal ("A&M"), a global professional services firm specializing in business advisory services including the application of economics, statistics, and valuation principles to questions that arise in the context of litigation. My experience includes analyzing the labor market for nurses including home health and private duty nurses.

2. I have been retained by counsel for Edward Lopez ("Mr. Lopez"), in the above captioned matter, as an expert in economics to analyze the wage-fixing allegations in Count 1 of the Superseding Criminal Indictment alleging a violation of the Sherman Act Section 1. My requested analyses include but are not limited to analysis of the labor market, wages, total compensation, and related issues. I have been engaged in this case to provide expert testimony applying established economic methodologies and principles based on the wage data provided by the Department of Justice and the Defense, as outlined in my Supplemental Expert Report dated March 19, 2025, and consistent with similar cases in which an economic expert is presented to assist the jury in deciding the facts.

3. On April 4, 2025, I (and one of my colleagues) met with the government's expert, Ms. Grinberg (and two of her colleagues) in accordance with the Court's order to meet and confer. Mr. Bradley was also in attendance but left shortly after introductions were made. The meeting was brief as Ms. Grinberg and her team only had a few questions.

4. The first question pertained to page 618 of my report, asking for clarification whether [MXMHS2019DOJ-0009880.xlsx] was relied on in any of my analyses. I answered the question and explained that the source documents for every chart and table in my report, exhibits, and appendices are identified on or below the respective chart or table. I directed their attention to a table on pages 19-20 of my report to demonstrate all sources were listed immediately below the table. Ms. Grinberg's team

confirmed they see all the sources are in fact identified, including [MXMHS2019DOJ-0009880.xlsx]. Ms. Grinberg had no other questions on this point.

5. The next question pertained to the CHHC data. Ms. Grinberg and team asked what the source of the data was for my analysis of the CHHC wage data. I explained that my analyses, charts, and tables for CHHC, Maxim, Aveanna, and NurseCore rely on the output files created using SAS. These output files and related SAS code were produced to the government on March 20, 2025. Based on their review, Ms. Grinberg and team confirmed that did not have any requests or questions related to my SAS code and output files that were previously produced.

6. Ms. Grinberg noted that my SAS script that was produced March 20th included an input file and asked what the source was for this input file. Ms. Grinberg indicated that she was told to rely on the Kantime data. I indicated that I had received and relied on CHHC and Solace documents produced by the Department of Justice, as well as data and documents from ADP, Paychex, and Kantime.

7. I explained that I used each of these data sources to corroborate the output data file that I ultimately relied on for my analysis, as indicated in my Supplemental Expert Report and Appendix A to my report.

8. I further explained that the PDF sources related to the CHHC wage data had to be entered manually into Excel and/or "scraped" (*i.e.,* using a computer program to extract information from a PDF) prior to conducting any further review or analysis of this information.

9. Ms. Grinberg's third question was a request that I provide the scraped data for CHHC, and the program or scripts used to extract the data, if applicable.

10. I explained that it was not my immediate team that scraped the data and/or entered the data manually and that I did not have the information with me to confirm if it was scraped or entered manually.

11. I did not rely on the scraped data files or the manually entered data files for my analyses, charts and tables. My analyses, charts, and tables for CHHC, Maxim, Aveanna, and NurseCore rely on the output files created using SAS. These are the only files needed to replicate my analyses related to CHHC, Aveanna, NurseCore, and Maxim.[1] The government had everything it needed to replicate my charts and tables since at least March 20, 2025.

12. The manually entered data files for the CHHC wage data are very similar to the output file I produced on March 20, 2025. The SAS code, that I also turned over on March 20, 2025, detailed all steps I used to create this final dataset. Importantly, I independently verified the data that was extracted from the PDFs (*i.e.,* the scraped and/or extracted data files). I relied on the PDFs and other files that were produced and which I identified in my Supplemental Expert Report and Appendix A to my report, to perform this verification.

13. Ms. Grinberg's fourth question was a request that I provide the scraped data for the Maxim earning statements and the program or scripts used to extract the data. I again indicated that I would have to confirm if it was scraped or entered manually. I confirmed that the Medicaid data was scraped, and the non-Medicaid data was entered manually.

14. Ms. Grinberg and I agreed that I would confer with Defense counsel as to the next step.

15. I did not inform Mr. Krotoski of my weekend schedule including a previously set medical appointment. It was not until approximately 4pm that I was able to check my messages at which time I had several emails and voicemail messages from Mr. Krotoski. At 4:05pm, Mr. Krotoski and I spoke on the phone, and it was the first time we spoke all day.

---

[1] With the exception of paragraphs 32(b) and 32(c) in my Supplemental Expert Report which rely on the Maxim earning statements.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

April 28, 2025

*Suzanne M. Stuckwisch*
Suzanne M. Stuckwisch